IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
No. 4:10-CV-121-D

| | |
|---|---|
| RICHARD SAMPSON, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>MIKE LEONARD, BRAD BAZEMORE, )<br>LEI ZHENG, and HOSPIRA, INC., )<br>)<br>Defendants. ) | **ORDER** |

On March 31, 2010, Richard Sampson ("plaintiff" or "Sampson") filed suit in Halifax County Superior Court against three former co-workers, Mike Leonard, Brad Bazemore, Lei Zheng (collectively "individual defendants"), and against his former employer Hospira, Inc. ("Hospira") [D.E. 1-1]. Sampson alleged that defendants wrongfully discharged him from employment in violation of North Carolina public policy, that defendants intentionally and negligently inflicted emotional distress, that defendants injured his business reputation, and that defendants engaged in a civil conspiracy to wrongfully discharge him. On September 3, 2010, defendants removed the action to this court based on diversity jurisdiction and asserted that Sampson fraudulently joined the individual defendants [D.E. 1].

On January 12, 2011, the court dismissed the individual defendants and dismissed Sampson's claims for intentional and negligent infliction of emotional distress, injury to business reputation, and civil conspiracy [D.E. 20]. Thus, Sampson's sole remaining claim is his North Carolina wrongful discharge claim against Hospira.

On October 31, 2011, Hospira moved for summary judgment on the wrongful discharge claim [D.E. 30] and filed a supporting memorandum and exhibits [D.E. 31]. On November 21, 2011, Sampson responded in opposition and filed supporting exhibits [D.E. 32]. On December 8,

2011, Hospira replied [D.E. 33]. On December 13, 2011, Sampson objected to Hospira's reply [D.E. 34]. As explained below, the court grants Hospira's motion for summary judgment.

I.

From July 2003 to July 2007, Hospira employed Sampson as a chemistry lab technician in Hospira's chemical plant in Rocky Mount, North Carolina (the "Rocky Mount plant"). See Sampson Dep. [D.E. 30-4] 10, 18, 119, Ex. 7; Leonard Decl. [D.E. 30-1] ¶ 7. In December 2006, Sampson had a brief intimate relationship with Shantres Clark ("Clark"), a fellow technician in the Rocky Mount plant. See Sampson Dep. 14–15. As a result, Clark became pregnant with Sampson's child. Id. Sampson is Native American, and Clark is African-American. See id. 13, 25.

On Friday, June 22, 2007, a co-worker announced "in front of the entire lab" that Sampson was the father of Clark's unborn child. Id. 19. On Monday, June 25, 2007, Mike Leonard ("Leonard"), Sampson's supervisor, called Sampson into his office and asked Sampson if he was the father of Clark's unborn child. Id. 20; see Leonard Decl. ¶¶ 2, 4. Sampson answered affirmatively, to which Leonard replied, "That's not good. That's not good," without elaborating further. Sampson Dep. 20. Leonard and Sampson then visited Lei Zheng ("Zheng"), the chemistry manager of the Rocky Mount plant. Sampson Dep. 20–21; Zheng Decl. [D.E. 30-2] ¶ 2. Zheng was "very emotional" about the news and told Sampson that she was "disappointed that Shantres Clark was pregnant from [Sampson]." Id. 21–22.[1] Leonard and Zheng made no other comments to Sampson about Clark's pregnancy. See Sampson Dep. 22.

On Tuesday, June 26, 2007, Leonard asked Sampson to repair a gas chromatography machine (the "CG") that was producing errant chromatogram readings. See id. 37, 53–54, 90–91, 95.

---

[1] For purposes of summary judgment, the court assumes that Leonard and Zheng made the statements that Sampson attributes to them. Cf. Leonard Decl. ¶ 20 (denying that he made "a comment... expressing disapproval that [Sampson] had gotten a co-worker pregnant"); Zheng Decl. ¶ 7 (denying that she expressed or implied "disapproval that [Sampson] had gotten a co-worker pregnant").

2

According to Sampson, as part of repairing the CG, he performed a number of "junk runs" with different working standards to determine the cause of the CG's errant readings. See id. 88–93. A working standard is essentially a control sample of a chemical solution, against which other samples of the solution are measured and tested. See id. 40–41. When the CG is functioning properly, a technician injects both a working standard and a solution sample into the CG. See id. The CG produces a chromatogram for both the standard and the sample, and the technician compares the respective chromatogram readings. See id.; see also id. 55. The chromatogram is automatically stored in a software application called Chem Store Chem Station ("Chem Store"). See id. 55–58; see also Leonard Decl. ¶¶ 15–16; Zheng Decl. ¶ 4.

To prepare a working standard, a technician measures an amount of the stock standard into a volumetric, and then dilutes the stock standard as prescribed. See Sampson Dep. 39, 42, 102. The technician then weighs the working standard and records the weight in a log book. Id. 52–53; Leonard Decl. ¶ 8. The technician also writes the weight on the volumetric itself. See Sampson Dep. 53. As a further safeguard, Hospira requires that a second technician sign off on the working standard's weight in the log book. See id. 16–17; Leonard Decl. ¶ 8; Bazemore Decl. ¶ 6; cf. Sampson Dep. 59–60. In addition, all chromatograms include the weight of the working standard and are time stamped and saved in Chem Store. See Sampson Dep. 86; Leonard Decl. ¶¶ 15–16; Zheng Decl. ¶ 4; see also Sampson Dep. 57–58.

According to Sampson, he performed the following steps to repair the CG. Sampson used a pre-existing working standard that he found in the lab to conduct two junk runs on the CG. Sampson Dep. 88–92. Both of these junk runs produced chromatograms with errant readings. Id. 91–92. Sampson did not record these two runs in the log book. Id. 90–91. Suspecting that the problem might be the working standard and not the CG, Sampson then prepared his own working standard with which to test the CG. Id. 53–54, 92–93. Sampson's working standard weighed 408.15 mg (the "408 standard"). Id. Sampson used the 408 standard to conduct a third junk run and

3

received another chromatogram with errant readings. See id. 92. After using the 408 standard to test the CG, Sampson washed out the volumetric. Id. 87. Because he received an errant reading with his self-prepared 408 standard, Sampson decided to breakdown and then reassemble the CG. Id. 92–95. Once Sampson reassembled the CG, he prepared another working standard that had a weight of 396.67 mg (the "396 standard"). See id.; see also id. 54. Sampson recorded the correct weight of the 396 standard on a worksheet, on the volumetric, and in Chem Store. See id. 77. However, he wrote 408.15 mg in the log book as the weight of the 396 standard. See id. 45–46, 74.

Sampson claims that on Wednesday, June 27, 2007, he realized that he had recorded the wrong weight for the 396 standard, and he corrected the log book by striking through "408.15 mg," recording "396.67 mg," and including the notation "wrong weight." See id. 45–46, 53, 95–96, Ex. 1 (log book entry); see also Leonard Decl. ¶ 10. Shortly thereafter, Leonard reviewed the log book and noticed that Sampson had changed a working standard's weight from 408.15 mg to 396.67 mg. Leonard Decl. ¶ 11. Leonard asked Sampson about the alteration to the log book, and Sampson explained that 408.15 mg was from the log book entry of another standard, and that he had mistakenly recorded that weight instead of 396.67 mg. See id.; see also Zheng Decl. ¶ 3. Leonard notified Zheng of the incident, and Zheng asked Sampson and Leonard to join Zheng in her office. Leonard Decl. ¶ 11; Zheng Decl. ¶ 3. Zheng asked to see the log book entry for the standard that supposedly weighed 408.15 mg. See Leonard Decl. ¶ 11; Zheng Decl. ¶ 3. Zheng and Leonard doubted Sampson's explanation for the 408.15 mg log book entry. Leonard Decl. ¶ 12.

When Sampson arrived at work on Thursday, June 28, 2007, Leonard asked Sampson to meet Leonard in Zheng's office. Sampson Dep. 36; see Leonard Decl. ¶ 12. In Zheng's office, Leonard again asked Sampson to explain the 408.15 mg entry. Leonard Decl. ¶ 12; Zheng Decl. ¶ 3; see Sampson Dep. 43. Sampson explained that he had mistakenly recorded the weight of another standard (i.e., the 408 standard), and he offered to provide the volumetric for the other standard as proof. See Sampson Dep. 44–47; Leonard Decl. ¶ 12; Zheng Decl. ¶ 3. Sampson went to retrieve

4

the volumetric for the other standard but returned without the volumetric. See Leonard Decl. ¶ 12; Zheng Decl. ¶ 3; Sampson Dep. 44–47, 87.

After Sampson returned empty handed, Leonard and Zheng accused him of falsifying data. See Sampson Dep. 47. Sampson then explained that the original recorded weight was simply a "transcription error." Leonard Decl. ¶ 13; Zheng Decl. ¶ 4. Leonard and Zheng did not believe Sampson's "transcription error" explanation because neither "396.67" nor "407.52" closely resembled the original log book entry of "408.15." Leonard Decl. ¶ 13; Zheng Decl. ¶ 4; cf. Sampson Dep. 48. Sampson was offended that Leonard and Zheng accused him of falsifying data and walked out of Zheng's office. Sampson Dep. 48. Sampson went to Steve Plating ("Plating"), a senior manager at the Rocky Mount plant, and informed Plating that Leonard and Zheng had accused Sampson of falsifying data. Id. 63. Plating told Sampson that an investigation would be conducted. See id. 63–65.

Suspecting that Sampson had falsified the original entry in the log book, Leonard and Zheng asked Brad Bazemore ("Bazemore"), a human resources employee, to investigate. Leonard Decl. ¶¶ 14–15; see Zheng Decl. ¶ 5. Zheng, Leonard, and Bazemore then met with Sampson and asked him to explain the log book entry. Leonard Decl. ¶ 15. Sampson stated that he could not remember what had happened, and expressed his frustration because he did not understand "what the big deal was" because both weights (408.15 mg and 396.67 mg) were "within specifications" for the working standard. Leonard Decl. ¶ 15; Zheng Decl. ¶ 4; Sampson Dep. 47. Leonard and Zheng told Sampson that the concern was not with whether the standard satisfied the specifications, but whether Sampson had actually weighed the working standard. Leonard Decl. ¶ 15; Zheng Decl. ¶ 4. Leonard and Zheng explained that because there was no evidence of a standard weighing 408.15 mg, they doubted that Sampson had performed an actual weighing. Leonard Decl. ¶ 15; Zheng Decl. ¶ 4; see Sampson Dep. 78–79, 86 (admitting that there is no evidence of the 408 standard). Sampson responded that he had recorded the weight of the standard into Chem Store. Leonard Decl.

5

¶ 15; Zheng Decl. ¶ 4; cf. Sampson Dep. 55–58. Leonard and Zheng then checked Chem Store. Although there was an entry for a standard weighing 396.67 mg, there was no entry for a standard weighing 408.15 mg. Leonard Decl. ¶ 15; Zheng Decl. ¶ 4; Bazemore Decl. ¶ 6; see Sampson Dep. 78–79, 86.

Leonard, Zheng, and Bazemore concluded that Sampson never weighed a standard before recording the weight of 408.15 mg in the log book and, therefore, had falsified the original log book entry. Leonard Decl. ¶ 16; Zheng Decl. ¶ 5; Bazemore Decl. ¶ 6; see Sampson Dep. 25, 47, 63. Accordingly, Leonard, Zheng, and Bazemore recommended that Sampson's employment be terminated for falsifying company documents. Leonard Decl. ¶ 16; Zheng Decl. ¶ 5; Bazemore Decl. ¶ 6.[2] Hospira suspended Sampson pending further investigation. Leonard Decl. ¶ 18; Bazemore Decl. ¶ 8. Hospira never found any evidence of a standard weighing 408.5 mg. Leonard Decl. ¶ 18; Bazemore Decl. ¶ 8. The Rocky Mount plant's human resources manager, the Rocky Mount plant's manager, and Hospira's corporate human resources department reviewed and approved the recommendation to terminate Sampson's employment. See Bazemore Decl. ¶ 8. On July 11, 2007, Hospira terminated Sampson's employment. Bazemore Decl. ¶ 8.

Hospira has a no-tolerance policy for falsifying company documents. See Bazemore Decl. ¶ 9, Ex. 1 (employee handbook); see also Leonard Decl. ¶ 6. Sampson knew that Hospira considered recording an activity that did not actually occur to be falsification of company documents, which is grounds for immediate termination. See Sampson Dep. 30; see also id. 69–70, Exs. 4, 5; Leonard Decl. ¶¶ 5–6. Since January 1, 2006, Hospira has terminated more than thirty employees at the

---

[2] Leonard, Zheng, and Bazemore also determined that Sampson violated company policy by performing steps out of order (i.e., entering 396.67 mg into Chem Store before making an entry into the log book) and by failing to have a second technician confirm the weight change in the log book. See Leonard Decl. ¶¶ 5, 8, 16; see also Zheng Decl. ¶ 5; Bazemore Decl. ¶ 6. Hospira did not terminate Sampson for these policy violations because Hospira considered these policy violations—unlike the deliberate act of falsifying data—"to be the product of simple sloppiness or unintentional mistakes on Sampson's part." Leonard Decl. ¶ 17; Bazemore Decl. ¶ 7.

6

Rocky Mount plant for falsifying company documents. Bazemore Decl. ¶ 9. In his deposition, Sampson stated that he heard a rumor that Hospira did not terminate another a lab technician, John Minchew ("Minchew"), for falsifying documents. See Sampson Dep. 31. Bazemore, however, dispelled this rumor by disclosing that although somebody once accused Minchew of falsifying a document, the accusation lacked merit. Bazemore Decl. ¶ 9.

## II.

Hospira seeks summary judgment on Sampson's claim that Hospira wrongfully discharged Sampson on the basis of his race, in violation of the public policy enunciated in the North Carolina Equal Employment Practices Act, N.C. Gen. Stat. § 143-422.2. See Mot. Summ. J. [D.E. 30] 1.[3] In making the argument, Sampson equates discrimination based on his interracial relationship with Clark with discrimination based on his race.

In considering Hospira's motion for summary judgment, the court views the evidence in the light most favorable to plaintiff and applies well-established principles under Rule 56 of the Federal Rules of Civil Procedure. See, e.g., Fed. R. Civ. P. 56; Scott v. Harris, 550 U.S. 372, 378 (2007); Celotex Corp. v. Catrett, 477 U.S. 317, 325–26 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–55 (1986); Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585–87 (1986). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as

---

[3] N.C. Gen. Stat. § 143-422.2 states in full:

It is the public policy of this State to protect and safeguard the right and opportunity of all persons to seek, obtain and hold employment without discrimination or abridgement on account of race, religion, color, national origin, age, sex or handicap by employers which regularly employ 15 or more employees.

It is recognized that the practice of denying employment opportunity and discriminating in the terms of employment foments domestic strife and unrest, deprives the State of the fullest utilization of its capacities for advancement and development, and substantially and adversely affects the interests of employees, employers, and the public in general.

7

to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Anderson, 477 U.S. at 247–48. The party seeking summary judgment bears the burden of initially coming forward and demonstrating an absence of a genuine issue of material fact. Celotex Corp., 477 U.S. at 325. Once the moving party has met its burden, the nonmoving party then must affirmatively demonstrate that there exists a genuine issue of material fact for trial. See Matsushita, 475 U.S. at 586–87. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson, 477 U.S. at 249. Conjectural arguments will not suffice. See id. at 249–52; Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) ("The nonmoving party . . . cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another."). Nor will a "mere . . . scintilla of evidence in support of the [nonmoving party's] position . . . ; there must be evidence on which the [fact finder] could reasonably find for the [nonmoving party]." Anderson, 477 U.S. at 252. In evaluating affidavits submitted in support of or in opposition to a motion for summary judgment, the court may reject inadmissible evidence (such as hearsay) described in such affidavits. See Fed. R. Civ. P. 56(c); Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 962 (4th Cir. 1996).

Because Sampson has no direct evidence that he was discharged due to his interracial relationship with Clark, his claim proceeds under the burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See, e.g., Hughes v. Bedsole, 48 F.3d 1376, 1383–84 (4th Cir. 1995); Lloyd v. New Hanover Reg'l Med. Ctr., No. 7:06-CV-130-D, 2009 WL 890470, at *4 (E.D.N.C. Mar. 31, 2009) (unpublished). A plaintiff must first establish a prima facie case of discrimination. See, e.g., St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993); Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252–53 (1981). If a plaintiff establishes a prima facie case, the burden shifts to the employer to produce evidence that the employer took the adverse employment action "for a legitimate, nondiscriminatory reason." Burdine, 450 U.S. at 254. If the employer offers admissible evidence sufficient to meet its burden of production, "the burden

8

shifts back to the plaintiff to prove by a preponderance of the evidence that the employer's stated reasons were not its true reasons, but were a pretext for discrimination." Hill v. Lockhead Martin Logistics Mgmt., Inc., 354 F.3d 277, 285 (4th Cir. 2004) (en banc) (quotation omitted); see, e.g., Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000); Burdine, 450 U.S. at 256; King v. Rumsfeld, 328 F.3d 145, 151 (4th Cir. 2003).

Sampson may establish a prima facie case of race discrimination by showing that (1) he is a member of a protected class; (2) his job performance was satisfactory; (3) he was terminated; and (4) other employees who are not members of the protected class were retained under similar circumstances. See Hughes, 48 F.3d at 1383; Carter v. Ball, 33 F.3d 450, 458–59 (4th Cir. 1994). If Sampson presents a prima facie case, Hospira then may "produc[e] evidence of legitimate, nondiscriminatory reasons for the dismissal." Hughes, 48 F.3d at 1383–84. If Hospira presents such evidence, Sampson then must show that Hospira proffered mere pretextual reasons for his termination. See Hill, 354 F.3d at 285; King, 328 F.3d at 151; Hughes, 48 F.3d at 1384. "[A]t the summary judgment stage, [Hospira] must demonstrate that no genuine issue of material fact exists and, in turn, [Sampson] must present evidence from which a rational jury might conclude that [he] was discharged because [of his race]." Hughes, 48 F.3d at 1384; see Fed. R. Civ. P. 56(a); Celotex Corp., 477 U.S. at 322; Anderson, 477 U.S. at 247–48; Matsushita Elec. Indus. Co., 475 U.S. at 587.

First, Hospira argues that Sampson is not a protected class member; therefore, he has failed to establish a prima facie case. See Mem. Supp. Mot. Summ. J. 10–12. Specifically, Hospira contends that a person in an interracial relationship is not a member of a class protected by section 143-422.2. See Mem. Supp. Mot. Summ. J. 11–12.

No North Carolina appellate court appears to have addressed whether discrimination due to an interracial relationship equates to race discrimination under section 143-422.2. Cf. Holcomb v. Iona Coll., 521 F.3d 130, 138–39 (2d Cir. 2008) (holding that discrimination due to an individual's interracial relationship may constitute "race" discrimination under Title VII). Sitting in diversity,

9

the court must predict how the Supreme Court of North Carolina would rule on this issue. See Twin City Fire Ins. Co. v. Ben Arnold-Sunbelt Beverage Co. of S.C., 433 F.3d 365, 369 (4th Cir. 2005). In making this prediction, the court is aided by the decisions of the North Carolina Court of Appeals, relevant treatises, and the practices of other jurisdictions, id., but must not "create or expand [North Carolina] public policy." Time Warner Entm't-Advance/Newhouse P'ship v. Carteret-Craven Elec. Membership Corp., 506 F.3d 304, 314 (4th Cir. 2007) (quotations omitted).

Instead of opining on this unresolved issue of North Carolina law, the court assumes (without deciding) that Sampson falls within the protected class and analyzes whether Sampson has established a prima facie case. Hospira argues that Sampson has not established a prima facie case because there is no evidence that (1) Sampson's job performance was satisfactory or (2) Hospira retained employees who are not in interracial relationships after those employees falsified documents. See Mem. Supp. Mot. Summ. J. 13–15.

Sampson has failed to raise a genuine issue of material fact concerning whether his job performance was satisfactory. Notably, Hospira has a no-tolerance policy for falsifying documents. See Bazemore Decl. ¶ 9; Hospira Employee Handbook [D.E. 30-3] 9; Sampson Dep. 30–31. Moreover, Hospira terminated Sampson for falsifying documents. See Leonard Decl. ¶¶ 16–19; Zheng Decl. ¶¶ 5–6; Bazemore Decl. ¶¶ 6, 8, 10; cf. Sampson Dep. 24–25.[4]

Likewise, Sampson has failed to raise a genuine issue of material fact as to whether other employees who are not members of the protected class were retained under similar circumstances. See Hughes, 48 F.3d at 1383–85; Carter, 33 F.3d at 460–61. In fact, Sampson has provided no evidence that Hospira retained another employee who falsified documents. See Bazemore Decl. ¶ 9 (noting that Hospira has fired 30 employees for falsifying documents from the Rocky Mount plant

---

[4] Regardless of whether the court analyzes this issue as part of the prima facie case or as part of the pretext analysis, Sampson has failed to raise a genuine issue of material fact regarding whether Hospira fired him because he falsified documents. See Smith v. Martin, No. 5:10-CV-248-D, 2011 WL 3703255, at *5 (E.D.N.C. Aug. 23, 2011) (unpublished).

since 2006 and dispelling rumor that Minchew falsified documents).

Because Sampson has not shown that his job performance was satisfactory or that Hospira retained other, similarly-situated employees of a different race who falsified documents, Sampson has failed to present a prima facie case of wrongful discharge. Accordingly, the court grants Hospira's motion for summary judgment.

Alternatively, even assuming that Sampson has presented a prima facie case of wrongful discharge, Hospira has presented a legitimate, non-discriminatory reason for discharging Sampson: falsifying company documents. Leonard Decl. ¶ 16; Zheng Decl. ¶ 5; Bazemore Decl. ¶ 6. Accordingly, the burden shifts back to Sampson to provide evidence that creates a genuine issue of material fact concerning whether Hospira's explanation is in fact pretext for intentional discrimination. See Holland v. Wash. Homes, Inc., 487 F.3d 208, 214 (4th Cir. 2007).

An employee may establish that the employer's true reason was discriminatory "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Burdine, 450 U.S. at 256; see Reeves, 530 U.S. at 143; Mereish v. Walker, 359 F.3d 330, 336 (4th Cir. 2004). "Thus, a key factor for courts to consider is the probative value of the proof that the employer's explanation is false." Holland, 487 F.3d at 215 (quotation omitted); see Reeves, 530 U.S. at 149. An employer is entitled to summary judgment on the issue of pretext if the employee "create[s] only a weak issue of fact as to whether the employer's reason [is] untrue and there [is] abundant and uncontroverted independent evidence that no discrimination occurred." Reeves, 530 U.S. at 148; see Holland, 487 F.3d at 215. To survive Hospira's motion for summary judgment, Sampson must demonstrate that there is a genuine issue of material fact concerning whether Leonard, Zheng, and Bazemore honestly believed that Sampson did not prepare a standard that weighed 408.15 mg. See Reeves, 530 U.S. at 148; Holland, 487 F.3d at 215; Smith, 2011 WL 3703255, at *4; Lloyd, 2009 WL 890470, at *5.

11

Sampson has not provided sufficient evidence for a rational jury to find that Hospira's explanation for terminating him is unworthy of credence. Leonard, Zheng, and Bazemore recommended that Sampson be terminated for falsifying company documents based on the honest belief that Sampson entered a weight of 408.15 mg into the log book without ever measuring a standard that weighed 408.15 mg. Leonard Decl. ¶ 16; Zheng Decl. ¶ 5; Bazemore Decl. ¶ 6. Moreover, in analyzing this pretext issue, the court is not concerned with whether Leonard, Zheng, and Bazemore were correct in believing that Sampson did not prepare a standard that weighed 408.15 mg. Rather, the court focuses only on whether they honestly believed Sampson did not. See, e.g., Holland, 487 F.3d at 217; Hill, 354 F.3d at 293–94.

Sampson insists that he has created a genuine dispute about whether Leonard, Zheng, and Bazemore honestly believed that Sampson did not prepare a standard that weighed 408.15 mg. In support, Sampson offers the declarations of Little and Strickland, two former Hospira employees, who opine that Sampson's conduct should not qualify as falsification of data. See Little Decl. ¶¶ 3–4, 9; Strickland Decl. ¶¶ 3–4, 8–9. However, the court is concerned only with the perception of the actual decision makers—Leonard, Zheng, and Bazemore—not the opinions of other third parties or co-workers. See Hill, 354 F.3d at 289–91; King, 328 F.3d at 153. Here, Leonard, Zheng, and Bazemore were unable to find any evidence confirming that Sampson ever prepared a working standard that weighed 408.15 mg. See Sampson Dep. 78–79, 86–87; Leonard Decl. ¶¶ 16, 18; Zheng Decl. ¶¶ 4–5; Bazemore Decl. ¶ 6. Thus, assuming Sampson offered a consistent and coherent story for why he altered the log book,[5] there remains the undisputed fact that Leonard, Zheng, and

---

[5] Leonard, Zheng, and Bazemore state that their conclusion that Sampson falsified the log book entry is based, in part, on Sampson having repeatedly changed his explanation for the 408.15 mg entry. See Leonard Decl. ¶ 16; Zheng Decl. ¶ 5; Bazemore Decl. ¶ 6. If Sampson did change his explanation, that fact also would support Leonard, Zheng, and Bazemore having honestly believed that Sampson lied about preparing a standard that weighed 408.15 mg. However, in the light most favorable to Sampson, Sampson provides a version of events in which he offered a consistent explanation to Leonard, Zheng, and Bazemore for the log book entry.

12

Bazemore could not find any evidence corroborating Sampson's story that he actually prepared a standard that weighed 408.15 mg. See Leonard Decl. ¶¶ 16, 18; Zheng Decl. ¶¶ 4–5; Bazemore Decl. ¶ 6; see also Sampson Dep. 78–79, 86. Indeed, Sampson himself concedes that if he had prepared a working standard that weighed 408.15 mg, there would have been some evidence of it, see Sampson Dep. 55–58, but there was none. See id. 78–79, 86. Other facts bolster the honest beliefs of Leonard, Zheng, and Bazemore. Specifically, Sampson never obtained a second technician's signature confirming the correct weight of the working standard and attempted to minimize the alteration to the log book when confronted by Leonard, Zheng, and Bazemore. See Leonard Decl. ¶ 16; Zheng Decl. ¶ 5; Bazemore Decl. ¶ 6; see also Sampson Dep. 47–48. In light of the undisputed evidence that Sampson could provide no proof that he had prepared a working standard that weighed 408.15 mg (and there should have been some), that Sampson never asked a second technician to confirm his correction to the log book, and that Sampson minimized the seriousness of the matter, no reasonable jury could conclude that Leonard, Zheng, and Bazemore did not honestly believe that Sampson had never prepared a working standard that weighed 408.15 mg and, therefore, had falsified the original entry in the log book.

Sampson also provided no evidence that Hospira discriminated against him due to his interracial relationship with Clark. The fact that Sampson was terminated one week after a co-worker disclosed that Sampson impregnated Clark is not evidence of race discrimination. See Riddick v. MAIC, Inc., 445 F. App'x 686, 689 (4th Cir. 2011) (per curiam) (unpublished). Moreover, even if Leonard and Zheng expressed disapproval on June 25, 2007, of Sampson having impregnated Clark, neither Leonard nor Zheng made a single comment about Sampson's race, Clark's race, or the fact that the two had been in an interracial relationship. See Sampson Dep. 21–22.[6] Similarly, although Little, a former Hospira employee, is "personally familiar with joking

---

[6] In his response to Hospira's motion for summary judgment, Sampson attached a declaration in which he states that "[w]hile walking out [of Zheng's office], Mr. Leonard made a negative

13

[of unidentified personnel] in the laboratory regarding Mr. Sampson and his relationship with [Clark]," Little Decl. ¶ 11, Little's recollection fails to suggest that the "joking" was due to the relationship being interracial. Indeed, Sampson has provided no evidence of a single Hospira employee expressing interest in—much less hostility against or discriminatory conduct on account of—Sampson and Clark being in an interracial relationship. Accordingly, no reasonable juror could find that Hospira terminated Sampson's employment due to race discrimination.

III.

No rational jury could find that Hospira terminated Sampson's employment because he had been in an interracial relationship with a co-worker. Accordingly, the court GRANTS Hospira's motion for summary judgment [D.E. 30]. The clerk shall close the case.

SO ORDERED. This 4 day of September 2012.

JAMES C. DEVER III
Chief United States District Judge

---

comment about my sleeping with someone of a different race." Sampson Decl. ¶ 11. Sampson's declaration, however, contradicts Sampson's earlier deposition testimony, in which he testified that Leonard and Zheng's comments were limited to Sampson having impregnated a co-worker, and did not broach the topic of race. See Sampson Dep. 21–22. In light of the conflict between Sampson's earlier deposition testimony and his eleventh-hour declaration, the court disregards the contradictory statement in Sampson's declaration. See Rohrbough v. Wyeth Labs., Inc., 916 F.2d 970, 975–76 (4th Cir. 1990); Barwick v. Celotex Corp., 736 F.2d 946, 960 (4th Cir. 1984).

14